**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:23-cv-21513-BLOOM/OTAZO-REYES**

MARIBEL PEREZ,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

      Defendant.

_____/

**REPORT AND RECOMMENDATION**

THIS CAUSE is before the Court upon Plaintiff Maribel Perez's ("Claimant") Motion for Summary Judgment with Supporting Memorandum of Law (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 9] and Defendant Kilolo Kijakazi, Acting Commissioner of Social Security's ("Commissioner") Response in Opposition to Claimant's Motion for Summary Judgment and Cross Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 11]. The administrative transcript (hereafter, "TR.") has been filed [D.E. 8].[1] For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

**PROCEDURAL HISTORY**

Claimant filed an application for disability insurance benefits ("DIB") on February 18, 2020, alleging a disability onset date of February 17, 2020. TR. 17. The application was denied initially and upon reconsideration. Id. Upon Claimant's written request, a hearing was held on

---

[1] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

September 29, 2022, before Administrative Law Judge Norman Hemming ("ALJ Hemming"), at which Claimant and Vocational Expert Mark Capps ("VE Capps") testified. Id. at 36–60.

On November 10, 2022, ALJ Hemming issued an Unfavorable Decision, finding the following:

(1) Claimant met the insured status requirements of the Social Security Act through December 31, 2024. Id. at 19.

(2) Claimant had not engaged in substantial gainful activity since February 17, 2020, the alleged onset date (20 C.F.R. § 404.1571 et seq.). Id.

(3) Claimant had the following severe impairments: obesity, spine disorders, dysfunction major joints, and inflammatory arthritis (20 C.F.R. § 404.1520(c)). Id.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). Id. at 21.[2]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform light work with certain limitations. Id. at 22.[3]

(6) Claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565). Id. at 28.

(7) Claimant was born on August 15, 1968, and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 C.F.R. § 404.1563). Id.

(8) Claimant had at least a high school education (20 C.F.R. § 404.1564). Id.

(9) Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Claimant was "not disabled," whether or not Claimant had

---

[2] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a) and 416.925(a).

[3] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite the claimant's limitations or impairments. See 20 C.F.R. § 416.945(a)(1). The RFC must be determined based on all of the claimant's impairments, even those that are not considered "severe." See 20 C.F.R. §§ 416.920 and 416.945.

        transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2). <u>Id</u>.

(10)  Considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Claimant could perform (20 C.F.R. §§ 404.1569 and 404.1569a). <u>Id</u>.

(11)  Claimant had not been under a disability, as defined in the Social Security Act, from February 17, 2020, through the date of the decision (20 C.F.R. § 404.1520(g)). <u>Id</u>. at 29.

On April 13, 2023, the Appeals Council denied a request for review of ALJ Hemming's Unfavorable Decision. <u>Id</u>. at 1–6. On April 21, 2023, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Hemming's final administrative decision [D.E. 1].

In support of her contention that ALJ Hemming's Unfavorable Decision should be reversed, Claimant argues that the vocational expert's testimony did not constitute "substantial evidence" upon which the ALJ could properly rely because there were several unresolved "apparent conflicts." <u>See</u> Claimant's Motion for Summary Judgment [D.E. 9 at 4]. The undersigned does not find merit in this contention.

## <u>RELEVANT MEDICAL EVIDENCE</u>

### I. Physical Health Providers

#### A. Treating Sources

##### 1) Vital Imaging Medical Diagnostic Centers

On October 17, 2019, Claimant underwent magnetic resonance imaging ("MRI") of her cervical spine at Vital Imaging Medical Diagnostic Centers. TR. at 522. The MRI revealed that Claimant had degenerative changes of the cervical spine most noted at C5-6, where there was mild to moderate canal stenosis and moderate to severe foraminal narrowing; and at C4-5, where there was severe right foraminal narrowing. <u>Id</u>. at 523. However, there was no cord compression or cord signal changes. <u>Id</u>.

### 2) Gary Goykhman, D.P.M. ("Dr. Goykhman")

On February 5, 2020, Claimant presented for an appointment at Miami Institute for Joint Reconstruction and was seen by Dr. Goykhman.  Id. at 551.  Dr. Goykhman noted that Claimant was 51 years old; that she was 5'4" tall and weighed 200 pounds; and that her body mass index ("BMI") was 34.33.  Id.  He further noted that Claimant took prednisone to treat rheumatoid arthritis in both of her knees.  Id.  Claimant relayed that she also had radiating pain from her buttocks to her ankle.  Id.

A general examination of Claimant revealed that she was adequately groomed with no evidence of malnutrition; that she was oriented to time, place, and person and had an appropriate mood and affect; and that she had good coordination.  Id. at 551–52.  An examination of Claimant's knees revealed that she was able to ambulate and fully bear her weight on them; and that she did not exhibit an antalgic gait.  Id. at 552.  Further, Claimant's knees had a full range of motion and 5/5 muscle power when extended and flexed.  Id.  However, Dr. Goykhman did find some effusion and edema in Claimant's knees.  Id.  Dr. Goykhman noted Claimant's diagnoses of unilateral primary osteoarthritis and rheumatoid arthritis in her knees, and sciatica; and referred Claimant for an MRI of her knees.  Id.

### 3) Olga Kromo, M.D. ("Dr. Kromo")

On August 4, 2020, Claimant presented for a new patient appointment at AARA Rheumatic Wellness and was seen by Dr. Kromo.  Id. at 604.  Claimant's chief complaints were her history of rheumatoid arthritis; joint pain/swelling; and neck/back pain.  Id.  She relayed the following symptoms: arthralgias, knee joint pain, feeling fatigued, neck pain, lower back pain, numbness, swelling of finger joints, pain in finger joints, joint pain in toes, shoulder joint pain, dry eyes, fatigue, mild hair loss, getting red in the sun, and dry skin.  Id.

Claimant explained that her pain had started in her left foot several years before and had resolved for a period of six months while she took a steroid medication; but that the pain had eventually returned and progressed to her hands, wrists, elbows, shoulders, hip, and ankles, after which time she was diagnosed with rheumatoid arthritis.  Id.  She further explained that she then started taking methotrexate and experienced diffuse body aches.  Id.  Claimant then saw a rheumatologist for two years and was prescribed hydroxychloroquine and leflunomide, but her inflammation and body aches did not resolve.  Id.  She reported that she had not seen a rheumatologist in three years.  Id.  Claimant stated that she was experiencing joint pain in her hands, wrists, shoulders, feet, and knees; had suffered from chronic knee swelling for three years; had hand and ankle swelling that came and went; and had difficulty straightening her knees.  Id.  Her knee pain worsened when she walked or stood; and she experienced stiffness that lasted all day.  Id.  She confirmed that she took prednisone; and opined that her hydroxychloroquine medication "kept her ou[t] of the hospital."  Id.  Claimant denied having recurrent fevers, rashes, mouth or nasal sores, dry mouth, pleuritic chest pains, Raynaud's phenomenon, deep vein thrombosis, or pulmonary embolism.  Id.  As for her neck/lumbar pain, Claimant reported that three years earlier her entire left side had become painful, after which episode, she was diagnosed with a bulging cervical/lumbar disc.  Id.  She relayed that this pain was constant, that the pain traveled down her left arm and left leg, and that she had mild numbness in her left hand.  Id.  Finally, Claimant reported that she was diagnosed with Lyme disease five years earlier but had improved after taking doxycycline for three to four months.  Id.

Claimant stated that she experienced difficulty with getting going in the morning, walking, dressing, grooming, and engaging in recreational activities.  Id. at 605.  A rheumatic review of systems revealed that Claimant was feeling fatigued and had dry eyes, a headache, mouth dryness,

abdominal pain, heartburn, polydipsia, heat and cold intolerances, sleep disturbances, photosensitivity, and alopecia.  Id. at 605–06.  A physical examination revealed that Claimant was cooperative; that she had pain in her hands, wrists, elbows, and shoulders; and that she had abnormal cervical spine rotation, muscle spasms in her cervical muscles, a normal thoracolumbar spine kyphosis but a limited range of motion and tenderness in her thoracolumbar spine, and spasms in her paraspinal muscles.  Id. at 607–08.  Further, Claimant's ability to transition from a sitting to a standing position was limited, her gait and stance were antalgic, and she had pain in her knees and feet that was elicited by motion.  Id. at 608.  Dr. Kromo also noted that Claimant's BMI was above normal.  Id.

Dr. Kromo administered bilateral knee injections of methylprednisolone to Claimant; and prescribed a new intravenous medication and dietary supplement.  Id. at 609.  Dr. Kromo further recommended that Claimant take a low dose of a muscle relaxant at bedtime to help manage her cervical paraspinal muscle spasms.  Id. at 610.

On February 23, 2021, Claimant presented for a follow-up appointment and was seen by Kristen Jordan, ARNP ("ARNP Jordan").  Id. at 684.  Claimant reported experiencing a lack of energy, stiffness, diffuse joint pain, hand synovitis, shoulder, foot, and knee pain, sicca, hair loss, and sacroiliac joint pain on her left side.  Id. at 685.  Claimant also reported that she was having trouble sleeping and carrying out activities of daily living; and that she had tried to decrease the dosages of her hydroxychloroquine and prednisone medications but that her pain had worsened as a result.  Id.  However, the muscle relaxant had helped with her neck/lumbar pain.  Id.  ARNP Jordan noted that Claimant appeared uncomfortable.  Id. at 688.  A physical examination revealed that Claimant had metacarpophalangeal joint synovitis, stiff elbows, diminished range of motion in her wrists and shoulders, diminished capacity to curl her fingers, diminished cervical rotation,

cervical and trap spasms, and pain when she squeezed with her hands.  Id.  However, Claimant did not exhibit any difficulty with balancing, or any tingling or numbness.  Id. at 686.  An examination of Claimant's joints revealed that she had several tender and swollen joints.  Id. at 690.

ARNP Jordan administered methylprednisolone and anti-inflammatory injections to Claimant; and noted that Claimant was awaiting authorization to commence the new intravenous medication.  Id. at 692.  She ordered an advanced blood test for Claimant; and indicated that Claimant would follow up in five weeks.  Id.

On September 14, 2021, Claimant presented for a follow-up appointment and was seen by Yailin Homen, ARNP ("ARNP Homen").  Id. at 738.  She reported that she still felt symptomatic. Id.  ARNP Homen noted that Claimant had been authorized to commence the new intravenous medication.  Id. at 745.  ARNP Homen further noted that Claimant had developed new rheumatoid nodules on her elbows and hand deformities.  Id.  ARNP Homen administered additional injections to Claimant; and indicated that Claimant would follow up in six weeks.  Id.

On September 16, September 30, and October 14, 2021, Claimant presented for appointments to receive infusions of the newly prescribed intravenous medication and was seen by Dr. Kromo.  Id. at 749, 752, 755.  Claimant's physical examinations revealed that her gait was not antalgic; that her cervical spine and lumbar/lumbosacral spine were normal; that she did not have any synovitis of her hands or wrists; and that she did not have any pain in her knees.  Id. at 750, 753, 756.  Further, a review of systems did not reveal any additional concerns.  Id.

On March 16, 2022, Claimant presented for a follow-up appointment and was seen by ARNP Homen.  Id. at 807.  ARNP Homen noted that Claimant was tolerating her medications well, with good benefits, but that she presented with pain in her right knee after she twisted it and that she was particularly inflamed that day.  Id.  Claimant requested an injection for the pain; and

further reported that she had undergone physical therapy in December 2021, with some benefits. Id. She also reported that she was attempting stretching exercises but had seen minimal benefits; and that she was using a transcutaneous electrical nerve stimulation ("TENS") machine with some benefits. Id. at 807–08. Claimant relayed that her anxiety had increased and was affecting her sleep; and that she had recently recovered from COVID-19. Id. at 808. Claimant further reported that her neck/lumbar pain was flaring up due to a pinched nerve. Id. ARNP Homen administered a knee injection to Claimant, counseled Claimant on lifestyle and dietary changes, and suggested that Claimant try cryotherapy. Id. at 815, 817.

On July 5, 2022, Claimant presented for a follow-up appointment and was seen by ARNP Homen. Id. at 846. Claimant reported an increase in her level of fatigue and symptoms due to discontinuing her prednisone medication. Id. She further reported an increase in the pain in her knees, lower back, and hands, despite her compliance with her other medications; and stated that she was willing to attempt physical therapy again. Id. at 847. ARNP Homen noted that Claimant had reported in May 2022 that stretching and massages improved her lower back pain, albeit only briefly; and that Claimant used her TENS machine and alternated between two anti-inflammatory medications every other day. Id. ARNP Homen administered bilateral knee injections to Claimant; counseled Claimant on the importance of proper nutrition and avoidance of inflammatory foods; and indicated that Claimant would be re-assessed in six to eight weeks. Id. at 854–56.

On August 11, 2022, ARNP Homen completed a medical statement regarding Claimant's inflammatory arthritis. Id. at 862. ARNP Homen indicated that Claimant had the following symptoms: history of joint pain, swelling, and tenderness; morning stiffness; synovial inflammation; limitation of motion in her joints; rheumatoid nodules; serum rheumatoid factor;

radiographic changes typical of inflammatory arthritis; inability to ambulate effectively; and inability to perform fine and gross movements effectively.  Id.  ARNP Homen further indicated that Claimant had inflammation in her hands, wrists, elbows, shoulders, hips, knees, ankles, feet, and spine; that she took steroid medication as needed; and that she suffered from significant fatigue and malaise.  Id. at 862–63.  In ARNP Homen's medical opinion, Claimant's physical abilities were limited as follows: standing at one time for 15 to 30 minutes; sitting at one time for 60 minutes to 2 hours; lifting 5 pounds on an occasional basis; and bending, stooping, grossly manipulating her left hand, and raising her arms over shoulder level only occasionally.  Id. at 863.  Moreover, ARNP Homen opined that Claimant could not work, lift on a frequent basis, or finely manipulate her hands.  Id.  ARNP Homen commented that Claimant had severe difficulty with walking and changing body position; that Claimant was unable to sleep due to her pain; and that Claimant had trouble concentrating due to her pain and lack of sleep.  Id. at 864.

### B.  Non-treating Sources

#### 1)  Hector J. Meruelo, M.D., P.A. ("Dr. Meruelo")

On July 7, 2020, Dr. Meruelo completed a consultative medical evaluation of Claimant. Id. at 592.  He noted that Claimant complained of "rheumatoid arthritis . . . a disc in [her] neck and [her] lower back[,] and . . . depression."  Id.  He further noted that Claimant was born in Miami and lived with her brother; that she used to do real estate office work; that she had a master's degree in business administration ("MBA"); that a usual day at home entailed not doing much and feeling very depressed; and that a rheumatologist had once told her that she had limited scleroderma, although Dr. Meruelo did not detect any physical findings of scleroderma in Claimant.  Id. at 594.  He also noted that Claimant weighed 230 pounds; that she looked her stated age; and that she was clean and adequately dressed but appeared slightly disheveled.  Id.

Dr. Meruelo observed that Claimant was an obviously depressed individual; that she walked slowly with demonstrations of pain and discomfort, although she did not have any specific limping or lumbar lists; that she had full range of motion of the lower back to 90 degrees; and that she did not use any ambulatory assisting devices. Id. Further, Dr. Meruelo observed that Claimant could get in and out of a chair and on and off the examining table by herself, although she requested his assistance; and that Claimant could not tandem walk or walk on her heels and toes due to the pain. Id. at 595. In her neck, Claimant exhibited an estimated 10% decrease in the range of motion to flexion, extension, and lateral left-to-right movements; no spasticity; and normal carotid pulses. Id. Moreover, Dr. Meruelo did not note any kyphoscoliosis or paravertebral spasticity in Claimant's spine. Id. An examination of Claimant's joints revealed that they were tender but not visibly inflamed; that Claimant had pain in her knees but no inflammation or effusion, although there was pain to mobilization; and that Claimant's hands failed to show any evidence of inflammation, although she could not fully extend one of her fingers. Id. at 596. Claimant also had 4/5 bilateral grip strength and 4/5 to 4+/5 strength in her arms and lower extremities, although she had pain in her joints, knees, and ankles. Id.

Dr. Meruelo rendered the following diagnostic impressions: Claimant had been diagnosed with rheumatoid arthritis several years earlier; Claimant was in the midst of a chronic depression and needed to reconsult with a rheumatologist to see if her medications were the most effective for her; he did not detect any neurological impairment of Claimant's upper or lower extremities, dexterity, or ambulation; and Claimant was exogenously obese. Id. at 596–97.

### 2) State Agency Medical Consultant Philip Matar, M.D. ("Dr. Matar")

On July 13, 2020, Dr. Matar completed an RFC assessment of Claimant at the initial level. Id. at 69. He found that Claimant had the following exertional limitations: she could occasionally

lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit and stand and/or walk about 6 hours in an 8-hour workday; and push and/or pull an unlimited amount, other than what was shown for lifting and/or carrying.  Id. at 70.  Further, Dr. Matar found that Claimant had frequent postural limitations in climbing ramps and stairs, balancing, kneeling, and crouching; and occasional postural limitations in climbing ladders, ropes, and scaffolds, stooping, and crawling. Id.  However, Dr. Matar found that Claimant did not have any manipulative, visual, communicative, or environmental limitations; and concluded that Claimant was capable of functioning within the parameters of the RFC that he had formulated.  Id. at 70–71.

### 3)  State Agency Medical Consultant Karen Young, M.D. ("Dr. Young")

On November 20, 2020, Dr. Young completed an RFC assessment of Claimant at the reconsideration level.  Id. at 88.  Dr. Young found that Claimant had the following exertional limitations: she could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; sit and/or walk for a total of 4 hours; and sit for about 6 hours in an 8-hour workday.  Id. at 89.  Further, Dr. Young found that Claimant was limited in her extremities when pushing and/or pulling; and that she had frequent limitation in her knees and elbows, with pain elicited on range of motion.  Id.  Dr. Young also opined that Claimant had frequent postural limitations in climbing ramps and stairs, balancing, kneeling, and crouching; occasional postural limitations in stooping and crawling; and no postural limitations in climbing ladders, ropes, or scaffolds.  Id. at 90.

Dr. Young found that Claimant was limited in reaching toward the front, laterally, and overhead; and limited in her gross and fine manipulation skills.  Id. at 90–91.  Dr. Young further found that Claimant should avoid concentrated exposure to the extreme cold and hazards but did not have any other environmental limitations; and that Claimant did not have any visual or communicative limitations.  Id. at 91–92.  Dr. Young concluded that Claimant was capable of

functioning within the parameters of the RFC that she had formulated.  Id. at 94.

## II.  Mental Health Providers

### A.  Treating Sources

#### 1)  Sonia I. Rente, M.D. ("Dr. Rente")

On September 17, 2020, Claimant presented to Dr. Rente's office for an appointment.  Id. at 653.  Claimant reported that an antidepressant that she had been prescribed had helped her to feel better; and that she was seeing a rheumatologist.  Id.  Dr. Rente observed that Claimant was oriented, less depressed, less anxious, and that she did not have any delusions or hallucinations. Id.

On November 10, 2020, Dr. Rente completed a medical source mental status report.  Id. at 657.  She reported that Claimant's mood and affect were slow and depressive; that her thought process was normal but that her thought content was negative; that her concentration, orientation, and memory were conservative; and that she did not have any hallucinations or perceptual disturbances.  Id. at 657–58.  Dr. Rente concluded that Claimant had major recurrent depression as a result of her chronic pain; and that she was incapable of sustaining work activity for eight hours a day, five days a week.  Id. at 658–59.

On April 1, 2021, Dr. Rente completed a medical assessment of Claimant's ability to do work-related activities.  Id. at 675.  She opined that Claimant had a fair ability to follow work rules, use judgment, and understand, remember, and carry out simple job instructions; a poor ability to relate to coworkers, interact with supervisors, function independently, maintain attention/concentration, understand, remember, and carry out detailed and complex job instructions, and maintain personal appearance; and no ability to deal with the public and work stress, behave in an emotionally stable manner, relate predictably in social situations, and

demonstrate reliability.  Id. at 675–76.  Dr. Rente further opined that Claimant was unable to cope with job-related conditions, tolerate stress, or keep self-control.  Id. at 676.

On July 5, 2022, Dr. Rente completed another medical assessment of Claimant's ability to do work-related activities.  Id. at 860.  In that second assessment, Dr. Rente opined that Claimant had a fair ability to follow work rules, interact with supervisors, function independently, and understand, remember, and carry out simple job instructions; a poor ability to use judgment, deal with work stress, understand, remember, and carry out detailed job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability; and no ability to relate to coworkers, deal with the public, maintain attention/concentration, and understand, remember, and carry out complex job instructions.  Id. at 860–61.

### B.  Non-Treating Sources

#### 1)  State Agency Psychological Consultants Julie Bruno, Psy.D. ("Dr. Bruno") and Robert Hodes, Ph.D. ("Dr. Hodes")

On July 16 and November 13, 2020, Dr. Bruno and Dr. Hodes completed assessments of Claimant at the initial and reconsideration levels, respectively.  Id. at 67, 85.  They each opined that Claimant's depressive symptoms contributed to mild limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself.  Id. at 68, 85.  Dr. Bruno also noted that Claimant had no periods of decompensation within the last year on file and that her mental health difficulties only minimally impacted her activities of daily living.  Id. at 69.  Dr. Bruno concluded that Claimant's mental health difficulties did not appear severe enough to preclude her from gainful employment.  Id.  Dr. Hodes likewise concluded that Claimant's activities of daily living did not indicate significant limitations other than due to her physical symptoms.  Id. at 87.

## **FUNCTION REPORT**

On May 25, 2020, Claimant completed a function report.  Id. at 244.  Claimant explained that her rheumatoid arthritis symptoms had not improved after treatment and physical therapy; that she could no longer stand or walk for too long; that her hands, ankles, and shoulders swelled, which made it difficult to get dressed, brush her hair, and brush her teeth; and that she could not carry things or do work with her hands.  Id.  She reported that, on a normal day, she would wake up and try to prepare breakfast for herself so that she could take her medications and, if she could, do some laundry; that she stayed home on most days and ordered groceries online to avoid walking and standing; and that she watched television or worked on a hobby if she could.  Id. at 245.  She stated that she did not take care of anybody and that she did not have any pets; and that she had been a very active person with lots of energy before the onset of her illness.  Id.  Claimant also reported that her medication and pain kept her awake at night and that she averaged three to four hours of sleep per night.  Id.  Claimant further reported that it was difficult to get dressed when her hands would swell; that it was difficult to bathe because she could not stand for too long or raise her arms; that her mother helped her care for her hair when she could not lift her arms; that sometimes she needed help to prepare her food; and that it was difficult to use the toilet without a cane or walker on bad days because of the pain in her knees and feet.  Id.

Claimant stated that she did not need reminders to take care of her personal needs or to take her medicine.  Id. at 246.  She reported that she was able to prepare simple meals two to three times per week and that her brother sometimes cooked for her; but that sometimes she was unable to cut or handle the food.  Id.  As for house and yard work, Claimant explained that she could do some laundry, light cleaning, and some cooking when she felt better, but that she did not have strength in her hands and could not bend down or rest on one knee.  Id. at 246–47.  She further

explained that she sometimes went outside to get some sun or to run an errand, but that she otherwise tried not to go outside because it was difficult and painful to walk and stand.  Id. at 247. Claimant stated that, when she did go outside, she could go out alone and drive.  Id.

Claimant indicated that her hobbies and interests included reading, watching television, going on the internet, and cooking on days that she felt better; and that she visited her mother, sister, and best friend occasionally and talked on the phone with others.  Id. at 248.  She listed the places that she went to on a regular basis as: the gas station; fast food restaurants; her mother's house; and errands destinations.  Id.  She only needed somebody to accompany her when she was experiencing a flare of her symptoms; and she did not indicate that she had any problems getting along with others.  Id. at 248–49.  Claimant reported that she did not engage in social activities because she felt useless and embarrassed to be out in public with her condition.  Id. at 249.  She stated that her condition affected the following abilities: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentrating, and using her hands; and that she could only walk 30 to 60 feet before needing to stop and rest.  Id.  She further reported that she could only pay attention for a few hours; that she could finish a task that she started; and that she could follow written and spoken instructions well.  Id.  Moreover, Claimant stated that she got along well with authority figures; that she'd never been fired or laid off from a job because of problems with getting along with others; that she could handle stress better since she started treatment with Dr. Rente; and that she could not handle changes in routine well.  Id. at 250.  Claimant had noticed that she had developed anxiety and fear regarding the progression of her condition and being a burden to her family; some depression because she could not do all the things that she used to do; and a loss of desire or interest for things.  Id.

Claimant indicated that she used a walker, a cane, corrective lenses, and a shower stool.

Id.  She stated that she used these items a few times a week to get around or when she had a bad flare up of her symptoms.  Id.  Claimant further stated that she took hydroxychloroquine, prednisone, an anti-inflammatory medication, and a medication to help treat her insomnia.  Id. at 251.

## HEARING TESTIMONY

A hearing was held on September 29, 2022, before ALJ Hemming, at which Claimant and VE Capps testified.  Id. at 36–60.

### I.    Claimant

Claimant testified that she was 54 years old, 5'4" tall, and weighed 200 pounds.  Id. at 41. She confirmed that she had a bachelor's degree in business administration and an MBA from St. Thomas University.  Id. at 42.  Claimant testified that she had worked at Site Seeing Tour Management Office in event planning, which had involved a combination of office work and touring a yacht with clients.  Id.  She confirmed that the role had entailed a lot of walking and climbing steps, as well as driving and lifting between 25 and 35 pounds.  Id. at 42–43.  Claimant further testified that she had also worked for a short period on a part-time basis at Regata Group LLC in the property management office, but that she could not sustain this employment because it had involved walking to apartments and climbing stairs.  Id. at 43.  In this role, Claimant testified that the heaviest thing she had had to lift was a box of files weighing 20 pounds.  Id.  She relayed that she later worked in real estate sales and as a general contractor for a company that renovated hotels.  Id. at 44–45.  Claimant testified that, as a general contractor, she did administrative work and set up remote offices, which had involved lifting or carrying upwards of 45 pounds at a time. Id. at 45.  She confirmed that she had not worked since 2019.  Id. at 46.

According to Claimant, by the beginning of 2020, her condition had worsened and was

unpredictable.  Id.  She testified that it was difficult to anticipate how she would feel on any given day and what she would or would not be able to do.  Id.  She further testified that nothing about her condition had really changed since beginning treatment; and that she had suffered from depression since the onset of her condition.  Id. at 46–47.  She stated that she had once been an active person and that it was difficult to see that she could no longer perform as she did before.  Id. at 47.  Claimant testified that she lived with her brother and that her mother and sister would visit to help her, as well.  Id.  She further testified that, on most days, she did not want to get out of bed but that she did not have a choice because she had to move around to ease her pain.  Id.  She testified that she no longer cooked and that she sometimes could not open containers.  Id.  She looked at things online, watched a little bit of television, and read; and her sister helped her with her laundry every 15 days or so.  Id. at 47–48.  Claimant testified that she drove only when necessary because she was afraid that she would otherwise cause an accident; that she no longer went to stores; and that her mother took her to her doctor's appointments.  Id. at 48.  She explained that she spent most of her time lying down or sitting.  Id. at 50.

Claimant testified that she had chronic inflammation throughout her whole body, especially in her knees; that the pain she experienced was an eight out of ten; and that her medications alleviated her pain only a little bit.  Id. at 50–51.  She testified that she could only walk maybe 50 feet at a time and that she could not hold herself up past that distance; that she could stand in a fixed position for maybe 5 to 10 minutes at most before she had to sit down; that she could not squat or kneel because it was painful and she would probably be unable to stand back up; that she could only lift a couple of pounds at a time; and that she could sit in a fixed position for maybe 15 minutes until she had to get up and stretch.  Id. at 51–52.

Claimant stated that she did not have energy; that she did not have the desire to do anything

or go anywhere; that she wanted to be home alone; and that she could no longer be who she used

to be.  Id. at 53.  She only ever saw close family members; and it gave her anxiety to leave her

house.  Id.  Claimant further testified that she slept terribly because she woke up throughout the

night due to the pain in her neck.  Id.

## II.     VE Capps

VE Capps classified Claimant's prior work as follows:

➤  Sales agent, business services, DOT #251.357-010, with an exertional level of
    medium,[4] and a Specific Vocational Preparation (hereafter, "SVP") of 5;[5] and

➤  Real estate agent, DOT #250.357-018, with an exertional level of light,[6] and an
    SVP of 5.

Id. at 54–55.

ALJ Hemming posed to VE Capps two hypotheticals for an individual of Claimant's age,

with her education and work experience who:

➤  could function solely at the light exertional level, stand or walk for a total of 4
    hours in an 8-hour work day, sit for a total of 6 hours in an 8-hour workday,
    frequently push and pull bilaterally with their hands and feet, frequently climb
    ramps and stairs, frequently balance, kneel, and crouch, occasionally stoop and
    crawl, never climb ladders, ropes, or scaffolds, and frequently handle and finger
    bilaterally; was unlimited with respect to feeling bilaterally; and could only
    have frequent exposure to extreme cold and hazards but unlimited exposure to
    extreme heat, wetness, humidity, noise, vibration, fumes, dusts, odors, gases,

---

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c) and 416.967(c).

[5] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM. An SVP of 5 means that preparation for the job should take "[o]ver 6 months up to and including 1 year."  Id.

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. §§ 404.1567(b) and 416.967(b).

and poor ventilation.  (Hypothetical No. 1).

> had the same parameters as the individual in Hypothetical No. 1 and the
> following additional limitations: could stand for no more than 30 minutes at a
> time, sit for no more than 2 hours at a time, lift occasionally no more than 5
> pounds, not lift 5 pounds on a frequent basis, occasionally bend and stoop, never
> finely manipulate with the left hand, occasionally manipulate with the right
> hand, occasionally grossly manipulate with the left hand, grossly manipulate
> with the right hand, occasionally raise the left arm over shoulder level, and
> occasionally raise the right arm over shoulder level; and was right-hand
> dominant.  (Hypothetical No. 2).

Id. at 55, 57–58.

VE Capps testified that the individual in Hypothetical No. 1 would not be able to perform

any of Claimant's past work because "the ability for being on [one's] feet would not be sufficient"

and that there were no transferable skills, but that the individual would be able to perform the

following jobs:

> Warehouse checker, DOT #222.687-010, with an exertional level of light, an
> SVP of 2,[7] and 10,600 jobs in the national economy;

> Assembler, small products, DOT #706.684-022, with an exertional level of
> light, an SVP of 2, and 32,000 jobs in the national economy; and

> Inspector and hand packager, DOT #559.687-074, with an exertional level of
> light, an SVP of 2, and 26,000 jobs in the national economy.

Id. at 56–57.  VE Capps further testified that the individual in Hypothetical No. 2 would be able

to perform a reduced range of sedentary work, but none of the individual's skills were transferable

to sedentary work; and that the individual's reduced hand abilities would eliminate all competitive

full-time work.  Id. at 58.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential

---

[7] An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to
and including 1 month."   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991),
http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

reconsideration of the findings of fact and exacting examination of the conclusions of law."

Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid."  Williams, 416 F. App'x at 862.

### REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Hemming determined that Claimant had not engaged in SGA since February 17, 2020, the alleged onset date.  TR. 19.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  Phillips, 357 F.3d at 1237.  In this case, ALJ Hemming found that Claimant suffered from the following severe impairments: obesity, spine disorders, dysfunction major joints, and inflammatory arthritis. TR. 19.  ALJ Hemming then proceeded to step three.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations. <u>Phillips</u>, 357 F.3d at 1238. If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four. <u>Id.</u> Here, ALJ Hemming determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. TR. at 21. Therefore, ALJ Hemming proceeded to step four.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work." <u>Phillips</u>, 357 F.3d at 1238. As to the first prong, ALJ Hemming determined that Claimant had the RFC to:

> perform light work . . . except that [Claimant] can stand or walk for a total of 4 hours in an 8-hour workday and can sit for a total of 6 hours in an 8-hour workday. She can frequently push and pull bilaterally in the hands and feet and can frequently climb ramps and stairs, balance, kneel, and crouch. [Claimant] can occasionally stoop and crawl. She can never climb ladders, ropes and/or scaffolds. [Claimant] can frequently handle and finger bilaterally, and have frequent exposure to extreme cold and to hazards.

TR. 22. Based on Claimant's RFC, ALJ Hemming moved to prong two of step four and concluded that Claimant was not able to perform any past relevant work. <u>Id.</u> at 28. ALJ Hemming then proceeded to the fifth and final step.

Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC. <u>Phillips</u>, 357 F.3d at 1239–40. ALJ Hemming determined that considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. <u>Id.</u> at 28.

Therefore, ALJ Hemming concluded that Claimant had not been under a disability, as

defined in the Social Security Act, from February 17, 2020, through the date of his decision.  Id.
at 29.

## **DISCUSSION**

As noted above, Claimant argues that the vocational expert's testimony did not constitute
"substantial evidence" upon which the ALJ could properly rely because there were several
unresolved "apparent conflicts."  See Claimant's Motion for Summary Judgment [D.E. 9 at 4].
The undersigned does not find merit in this contention.

Claimant argues that ALJ Hemming's decision was not based on substantial evidence
because there was an apparent conflict between her RFC and the three light exertional jobs about
which VE Capps testified, namely, warehouse checker, small products assembler, and inspector
and hand packager.  Id.  Specifically, Claimant argues that "there [was] no testimony from the VE
to explain how these . . . jobs in particular could be performed with only four hours of standing or
walking in an eight-hour day, [as provided for in Claimant's RFC,] nor does the ALJ's decision
identify or resolve this apparent conflict."  Id.  Claimant contends that Social Security Ruling
("SSR") 83-10 contemplates that "the full range of light work requires standing or walking, off
and on, for a total of approximately 6 hours of an 8-hour workday" and that "[s]itting may occur
intermittently during the remaining time".  Id. at 6 (emphases removed).  Claimant argues,
therefore, that "the demands of the light exertional jobs named by the VE" exceed Claimant's
RFC, which "plainly limits [her] to just four hours of standing or walking in an eight-hour
workday"; and that ALJ Hemming failed to resolve this apparent conflict.  Id.

However, the Commissioner responds that Claimant has failed to show that an apparent
conflict existed.  See Commissioner's Motion for Summary Judgment [D.E. 11 at 5].  The
Commissioner argues that, although "the DOT description[s] of the jobs do assign them at the light

exertional level, nowhere in the description[s] do any of the jobs [] state that [] they require *more than four hours of standing and walking.*"  Id. at 6 (emphasis in original) (citations omitted).  The Commissioner further argues that Claimant's reliance on SSR 83-10's definition of light work for the existence of a conflict is misplaced, given that the Eleventh Circuit only requires an ALJ "to resolve an apparent conflict between the VE's testimony and the DOT, not any other sources or definitions."  Id. (citing Webster v. Comm'r of Soc. Sec., 773 F. App'x 553, 555 (11th Cir. 2019)).  The Commissioner adds that, while SSR 83-10 does contemplate that "*the full range of light work* requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday", here, ALJ Hemming did not find that Claimant could perform the full range of light work.  See Commissioner's Motion for Summary Judgment [D.E. 11 at 7] (emphasis in original).  Instead, ALJ Hemming found that Claimant could perform "a reduced range of light work with only standing and walking for four hours in a workday."  Id. (referencing TR. 22).  Thus, the Commissioner contends that ALJ Hemming's decision was supported by substantial evidence, including VE Capps' testimony.

> The Eleventh Circuit teaches that:
>
> SSR 00-4p imposes a duty on ALJs to identify and resolve apparent conflicts between DOT data and VE testimony, and this duty is not fulfilled simply by taking the VE at his word that his testimony comports with the DOT when the record reveals an apparent conflict between the VE's testimony and the DOT. Rather, as we see it, the ALJ has an affirmative obligation to identify any "apparent" conflict and to resolve it. The failure to properly discharge this duty means the ALJ's decision is not supported by substantial evidence.
>
> . . .
>
> At a minimum, a conflict is apparent if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out not to be the case. Since the ALJs frequently use the DOT, treat it as an authoritative source, and actively investigate the evidence for and against granting disability benefits, identifying these "apparent conflicts" falls well within their wheelhouse.

See Washington v. Comm'r of Soc. Sec., 906 F.3d 1353, 1362, 1365 (11th Cir. 2018).  Thus, as correctly noted by the Commissioner, "[an] ALJ is only required to [independently verify a VE's testimony] when there is a conflict between the VE's testimony and the DOT."  See Webster, 773 F. App'x at 555–56 (citing Washington, 906 F.3d at 1365).  Here, each of the DOT listings suggested by VE Capps is silent about the extent of standing and walking expected for the job.  See DOT #222.687-010 (warehouse checker); DOT #706.684-022 (small products assembler); DOT #559.687-074 (inspector and hand packager).  As such, there was no apparent conflict between the DOT listings for these jobs and VE Capps' testimony in response to ALJ Hemming's hypothetical question that incorporated Claimant's RFC.  See, e.g., Christmas v. Comm'r of Soc. Sec., 791 F. App'x 854, 857 (11th Cir. 2019) ("Washington does not require the ALJ to draw inferences about job requirements that are unsupported by the DOT's text and then resolve conflicts between the VE's testimony and those unsupported inferences.").  Given the foregoing, ALJ Hemming's decision was supported by substantial evidence, including VE Capps' testimony.

Claimant also argues that "the Medical-Vocational Guidelines direct a finding of 'disabled' pursuant to Rule 201.14."  See Claimant's Motion for Summary Judgment [D.E. 9 at 8].  However as noted by the Commissioner, this argument lacks merit.  See Commissioner's Motion for Summary Judgment [D.E. 11 at 7].  Rule 201.14 assumes that a claimant's maximum sustained work capability is limited to sedentary work and directs a finding of "disabled" if the claimant's skills are also not transferable.  See 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 201.14.  Here, ALJ Hemming did not find that Claimant was limited to sedentary work but instead found that she was limited to light work with certain limitations.  TR. 22.  ALJ Hemming noted that, if Claimant had the RFC "to perform the full range of light work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.14."  Id. at 29; see also 20 C.F.R. Part 404, Subpart P, Appendix

2, Rule 202.14.  However, ALJ Hemming acknowledged that Claimant's "ability to perform all or substantially all of the requirements of this level of work ha[d] been impeded by additional limitations", which necessitated his reliance on VE Capps' testimony "[t]o determine the extent to which [Claimant's] limitations erode[d] the unskilled light occupational base".  TR. 29.  Thus, ALJ Hemming did not err in his application of the Medical-Vocational Guidelines or in relying on VE Capps' testimony to determine that, notwithstanding Claimant's limitations, there were jobs that existed in significant numbers in the national economy that she could perform.  Id.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 9] be DENIED, the Commissioner's Motion for Summary Judgment [D.E. 11] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Beth Bloom, United States District Judge.  Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 18th day of October, 2023.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:   United States District Judge Beth Bloom
      Counsel of Record